*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTHONY MICHAEL BUTLER,

        Defendant-Appellant.

UNPUBLISHED
July 16, 2026
2:58 PM

No. 368935
Genesee Circuit Court
LC No. 19-045167-FC

Before: GADOLA, C.J., and BOONSTRA and CAMERON, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial conviction of five counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(2)(b) (victim under 13 years old). The trial court sentenced him as a second-offense habitual offender, MCL 769.10, to five concurrent terms of 25 to 100 years' imprisonment.[1] We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant's convictions arose from his sexual assaults of his daughter, LM. LM testified that defendant and her mother split up when she was about six years old, and they had a 50/50 custody arrangement. LM stated that she was about seven or eight years old the first time that defendant sexually assaulted her. She testified that defendant gave her a "Whippet" to dull her senses. She described a "Whippet" as a balloon filled with nitrous oxide that makes a person "loopy." Defendant then sexually assaulted her, including digital-vaginal and penile-vaginal penetration. LM estimated that defendant sexually assaulted her over 150 times over the years during LM's visits for defendant's parenting time. When LM got older, defendant had her inhale marijuana before the sexual assaults.

---

[1] The original judgment of sentence indicated that the terms were to be served consecutively, but the trial court later resentenced defendant to impose the sentences concurrently.

On cross-examination, LM admitted that she did not mention Whippets or being drugged during a previous investigative interview, and that she told the interviewer that she didn't remember much of the first assault because she was sleeping when it happened. LM stated that she lied to the interviewer about being asleep during the assault because she was scared of defendant. She also acknowledged to the interviewer that her mother had promised her that they would go to a restaurant "as a celebration for telling them everything." And she admitted that she never testified about Whippets or being drugged during defendant's preliminary examination.

Brianna Conn dated defendant on and off for about eight years, beginning when LM was about seven years old. Conn began to suspect that defendant was acting inappropriately with LM, and she reported her concerns to Children's Protective Services (CPS) in 2018. Conn testified that she was vocal about defendant's misdeeds on social media because she believed that he was a "monster." On cross-examination, she admitted that she posted on social media that defendant was "being charged with 11 counts of CSC." She acknowledged that defendant was actually charged with five counts, but she said that "[i]t started off with 11 and went down to five."

In July 2018, LM's mother told LM that Conn had made some allegations about sexual activities between defendant and LM, and she asked LM if the allegations were true. LM, who was about 12 or 13 years old at the time, denied the allegations because she was scared. Later, on the way home from a therapy appointment, she told her mother that the allegations were true. LM's mother took LM back to the therapist, and LM spoke with the therapist about the assaults. LM's mother also called the police and took LM to the hospital for examination by a sexual-assault nurse examiner (SANE). The SANE nurse testified that LM had a "well healing notch" in her hymen. On cross-examination, she clarified that the notch was already healed, that LM had no current physical injuries at the time of the examination, and that no pictures were taken.

After trial, the jury convicted defendant on all five counts of CSC-I. Defendant appealed and later moved for a new trial and a *Ginther*[2] hearing in the trial court. The court denied the motion. Defendant then filed a motion to remand for a *Ginther* hearing in this Court, which we denied.[3]

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied the effective assistance of counsel because defense counsel failed to present or object to certain evidence, failed to adequately cross-examine witnesses, and failed to qualify a doctor as an expert witness. We disagree.

## A. STANDARD OF REVIEW

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). A

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] *People v Butler*, unpublished order of the Court of Appeals, entered November 10, 2025 (Docket No. 368935).

court's findings of fact are reviewed for clear error, and questions of constitutional law are reviewed de novo. *Id*. When no *Ginther* hearing is held, our review "is limited to mistakes that are apparent on the record." *People v Anderson*, 322 Mich App 622, 628; 912 NW2d 607 (2018) (quotation marks and citation omitted).

To obtain relief on the basis of ineffective assistance of counsel, "the defendant must show that counsel's performance fell short of [an] objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the defendant's trial would have been different." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks and citation omitted). See also *Strickland v Washington*, 466 US 668, 690, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ackley*, 497 Mich at 389 (quotation marks and citation omitted).

## B. PRESENTATION OF EVIDENCE AND CROSS-EXAMINATION

Defendant contends that he was denied the effective assistance of counsel because his attorney did not effectively cross-examine various prosecution witnesses and did not adequately support a viable theory that LM's mother and Conn conspired to make up allegations against defendant to help LM's mother in a custody battle over LM.

According to defendant, his defense theory was that LM's allegations were not credible because they stemmed from a custody dispute between LM's mother and defendant. He asserts that LM's mother stated during a custody hearing that she wanted to modify defendant's parental rights because LM had witnessed defendant physically assault Conn and two other people. He argues that defense counsel should have impeached LM's mother with her statements from the custody hearings to establish that LM's mother and Conn were motivated to lie about the sexual assaults to "punish [defendant] and eliminate his parental rights." But defendant's argument relies heavily on transcripts from the custody hearings that are not part of the lower court record. See *Anderson*, 322 Mich App at 628 (limiting review to mistakes apparent on the record). We therefore decline to consider whether defense counsel could have admitted those transcripts substantively or for the purpose of impeachment.

In any event, defense counsel may have chosen, as a matter of trial strategy, to refrain from delving into details about defendant's criminal or CPS history. See *Ackley*, 497 Mich at 388 (noting "the strong presumption that counsel's performance was born from a sound trial strategy") (quotation marks and citation omitted). Presenting such information could have opened the door to further questioning by the prosecutor, which could have framed defendant as a violent person. Furthermore, defense counsel elicited testimony from Conn that she had posted on social media that she and LM's mother would do whatever they could to have defendant "locked up forever." He also elicited testimony from LM that her mother had tried to change the 50/50 custody arrangement, but LM told the court in a custody hearing just a few months before the sexual-assault

allegations that she liked the current custody arrangement.[4]  Defense counsel's line of questioning suggested the possibility of an improper motive without highlighting the unrelated allegations against defendant.  This was a matter of trial strategy, not deficient performance.

Defendant also contends that defense counsel should have impeached Conn and LM's mother with statements that LM made during a forensic interview and during the preliminary examination, in which LM indicated that Conn had told LM's mother that she had called CPS about the sexual-abuse allegations because defendant was about to be released from jail, and Conn wanted him to stay in jail because "she suspected something was going on."  But those statements were not only layered hearsay that likely would have been inadmissible, but they in any event would not have been effective in impeaching LM's mother or Conn.  Conn stated at trial that she did not call CPS earlier about her concerns because it was taking some time for things to "click" and because she was "terrif[ied]" of defendant's verbal and physical abuse.  Conn also stated that she believed that defendant was a "monster" and that she posted on social media that she and LM's mother would do whatever they could to have him "locked up forever."  LM's statements did not belie that testimony.  Accordingly, no ineffective assistance of counsel is apparent with regard to counsel's failure to use those statements for impeachment.

Similarly, defendant argues that defense counsel should have used Conn's statements from a CPS interview (about speaking with LM's mother on the phone immediately before contacting CPS) to prove that they were conspiring against him.  But he relies on CPS documents that the trial court expressly protected from discovery because they were privileged records.  Because those documents were never introduced below, we decline to consider them.  See *Anderson*, 322 Mich App at 628.

Defendant next contends that when LM's mother stated that she first learned of the sexual-abuse allegations from CPS, defense counsel should have impeached her with her statement to the police that she had first learned of them from Conn's ex-husband on Facebook.  But counsel *did* impeach her in this manner, and she admitted that she probably told the police as much.  Defendant argues that defense counsel should have offered the police report into evidence or asked an officer-witness what she had told him, but that hearsay would have been inadmissible.  See MRE 801(c); MRE 802.  For the same reason, defense counsel was not ineffective for failing to admit LM's statement during a forensic interview that her mother told her, "I don't need [Conn] lying for me, I can do this by myself."

Defendant raises several similar arguments that defense counsel failed to properly impeach LM's testimony, citing instances in which LM affirmatively denied any sexual abuse or drug use at the hospital, at a therapy appointment, and during forensic interviews.  But defense counsel *did* cross-examine LM extensively about the inconsistencies between her trial testimony and her statements to other professionals.  That questioning elicited testimony that LM did not tell those people about the sexual abuse or drugs but not that she had affirmatively denied those allegations.

---

[4] We note that when defendant testified and was asked why LM would have fabricated allegations against him, he stated that he did not know.  This testimony would have hampered defense counsel's attempt to advance a custody-dispute theory.

-4-

LM explained that she had previously lied because she was scared of defendant. Given that LM had already admitted to lying, that she was still a minor at the time of trial, and that the trial involved an extremely sensitive subject matter, defense counsel may have reasonably decided not to drill LM with follow-up questions to extract the most favorably worded testimony.

Finally, defendant argues that defense counsel should have used the report of LM's negative drug screen and LM's mother's statements about the screen during a CPS interview to impeach LM and her mother after they each testified that they could not recall when LM was tested for marijuana. But defendant never provided the report to the trial court or to this Court. And the mother's statement about the date of a drug screen during a 2018 interview is not inconsistent with the statement that she could not remember the date during a trial nearly five years later. Both LM and her mother testified that LM tested negative for marijuana, so there was nothing to impeach.

The evidence apparent in the record shows that defense counsel made reasonable use of his time in cross-examination and presented evidence in a manner that cast doubt on the witnesses' credibility without exposing the jury to needlessly cumulative or prejudicial evidence. The fact that the jury believed the allegations despite defense counsel's efforts did not mean that his performance was deficient. See *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020) ("A trial strategy is not ineffective simply because it ultimately does not succeed.").

## C. BILL OF PARTICULARS

Defendant also contends that defense counsel should have requested a bill of particulars to assist him in preparing for his defense. According to defendant, a bill of particulars would have provided him with the dates and circumstances of the offenses, which would be necessary to identify witnesses who could "corroborate or disprove [LM's] version of events." MCR 6.112(E) states that "[t]he court, on motion, may order the prosecutor to provide the defendant a bill of particulars describing the essential facts of the alleged offense." But when "a preliminary examination adequately informs a defendant of the charge against him, the need for a bill of particulars is obviated." *People v Harbour*, 76 Mich App 552, 557; 257 NW2d 165 (1977). Furthermore, even if a defendant plans to present an alibi defense, "[t]ime is not of the essence, nor is it a material element, in criminal sexual conduct cases involving a child victim," *People v Dobek*, 274 Mich App 58, 83, 732 NW2d 546 (2007), and the trial court specifically instructed the jury that the prosecutor did not have to prove the date or time of the offense beyond a reasonable doubt. LM testified during defendant's preliminary examination in June 2019, and defense counsel used that testimony for impeachment during cross-examination at trial. Given that the date and time was not a material element of the offense and defendant was otherwise apprised of the charges against him during the preliminary examination, counsel did not act below an objective standard of reasonableness by failing to request a bill of particulars. *Ackley*, 497 Mich at 389.

## D. STANDARD 4 BRIEF

In defendant's Standard 4 brief,[5] he argues that defense counsel should have called Dr. Stephen Guertin as an expert witness at his trial. Defendant speculated that Dr. Guertin would have testified that photographs should have been taken during LM's SANE examination to conclusively verify that LM had a notch in her hymen and that defendant's alleged penile-vaginal penetration of LM was a "medical impossibility" because it would have resulted in damage to her hymen.[6] But LM already testified that she remembered seeing blood after the first sexual assault, and the SANE nurse, who was qualified as an expert in SANE examinations, testified that LM had a well-healed notch on her hymen. The nurse also acknowledged during cross-examination that the notch could have been caused by an activity such as riding a bicycle[7] and that photographs were not taken during the examination, which was contrary to the standard practice. The doctor who conducted the examination testified that "there is no longstanding signs of trauma from [damage to the hymen], it just heals." Given this testimony, defendant has not established how additional testimony from Dr. Guertin would have changed the outcome of his trial. See *Ackley*, 497 Mich at 389.

Defendant contends that defense counsel should have objected when the prosecutor admitted social media messages between defendant and LM, but he fails to explain why they would have been inadmissible, especially given that they contained incriminating statements made by defendant himself. See MRE 801(d)(2)(A). He also names several potential witnesses whom defense counsel allegedly should have interviewed or called to the stand. But the record contains no affidavits or other evidence to show whether those potential witnesses would have provided the exculpatory testimony that defendant asserts, let alone whether the testimony would have been admissible and would have affected the outcome of the case. This Court will not unravel and elaborate defendant's arguments for him, especially if the existing record does not provide a basis for his claims. *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001); *Anderson*, 322 Mich App at 628. Similarly, we decline to consider defendant's argument that his counsel was ineffective for failing to introduce a social-media message allegedly attributed to Conn because that post was never made part of the lower court record.

---

[5] See Administrative Order No. 2006-6, 471 Mich civ (2004). Defendant filed a Standard 4 Brief, to which the prosecutor filed a response. This Court then granted defendant's motion to file a reply brief. *People v Butler*, unpublished order of the Court of Appeals, entered July 1, 2026 (Docket No. 368935).

[6] We decline to consider Dr. Guertin's letter that defendant attached to his brief in support of this argument because it was not part of the lower court record. See *Anderson*, 322 Mich App at 628.

[7] She also explained that a hymen never truly "goes away" and is always present regardless of a person's age or sexual activity.

### III.  PROSECUTORIAL MISCONDUCT

Defendant alleges several flaws in the prosecutor's handling of the case, including his failure to correct false testimony and his failure to assist in locating and serving defense witnesses. These arguments fail.

### A.  PRESERVATION AND STANDARD OF REVIEW

The issue regarding failure to correct false testimony is unpreserved because defendant did not raise it in the trial court.  See *People v Norfleet*, 317 Mich App 649, 660; 897 NW2d 195 (2016).  "Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights." *Id*. at 600 n 5.  The defendant must demonstrate that a clear or obvious error occurred that affected the outcome of the lower-court proceedings.  *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).  "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (quotation marks, citation, and brackets omitted).

Defendant preserved the issue regarding the prosecutor's assistance in locating witnesses by including it in his motion for a new trial.  We review a trial court's decision on a motion for a new trial for an abuse of discretion.  *People v Lemmon*, 456 Mich 625, 648 n 27; 576 NW2d 129 (1998).  "A trial court abuses its discretion when it selects an outcome that does not fall within the range of reasonable and principled outcomes." *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008).

### B.  ALLEGEDLY FALSE TESTIMONY

According to defendant, he was denied the right to due process because several witnesses provided false testimony at his trial, yet the prosecutor used that testimony against him instead of correcting the false statements.  We disagree.

"It is inconsistent with due process when the prosecution allows false testimony from a state's witness to stand uncorrected." *Smith*, 498 Mich at 475.  A prosecutor has a duty to correct false testimony and must not use it to obtain a conviction. *Id*. at 475-476.  However, the prosecutor need not play the role of defense counsel and ferret out ambiguities in testimony. *Id*. at 477.  In addition, "not every contradiction is material and the prosecutor need not correct every instance of mistaken or inaccurate testimony." *Id*. at 476 (quotation marks and citation omitted).  A new trial is warranted if false testimony was reasonably likely to have affected the outcome of the trial. *Id*.

Defendant contends that LM was lying when she testified that she had never been asked about defendant giving her Whippets or other drugs and that the prosecutor promoted that false testimony.  Defendant again relies on documents that were not part of the lower court record.  A party may not expand the record on appeal, so we decline to consider them.  See *People v Gingrich*, 307 Mich App 656, 659 n 1; 862 NW2d 432 (2014).  And although LM testified on the third day of trial that she eventually told the "police or prosecution" about Whippets, that statement does not prove that she had been lying the day before when she stated that she had never been *asked* about them.  In any event, this alleged inconsistency in LM's testimony was immaterial because it

was already undisputed that LM did not mention Whippets or marijuana to several investigative and medical professionals both before and after the allegations came to light. The prosecutor was not required to catch and correct such an inconsequential variance in testimony. See *Smith*, 498 Mich at 476.

Defendant also alleges that LM's mother lied when she testified that she gave LM's cell phone to the police immediately after speaking to them on July 18, 2018, because a police report states that the phone was turned over on July 19. The mother admitted that her "brain was scattered" on July 18. And the trial took place in 2023, nearly five years later. That she may have been one day off regarding the date of the phone collection was inconsequential. In fact, it was *defense counsel* who elicited the testimony. Presumably defense counsel had access to any relevant police reports, yet he did not impeach LM's mother about the timing. Defendant asserts that the extra day could have given LM's mother time to manufacture evidence against him by manipulating messages on LM's phone. But the jury could still have inferred from the evidence that LM's mother may have framed him—it had already heard testimony that LM's mother was in a custody dispute with defendant and that LM did not speak of any abuse by defendant until after her mother had asked her about the allegations. The timing of events in this case was not so sensitive that one day's difference would undermine that defense theory. The prosecutor was therefore not required to correct the mistaken testimony. See *id*.

Defendant further contends that Conn falsely testified that she had only spoken to the police once about the inappropriate behavior that she witnessed between defendant and LM. He points to an additional conversation between Conn and the police in 2019 that is summarized in a police report that was never made part of the lower court record. But even defendant's summary of the document clearly shows that this alleged conversation did not involve a discussion about the inappropriate behavior. We do not see how Conn's unrelated conversation with the police proves that her testimony was false, so there was no need to correct her statements during trial.

Conn also testified during cross-examination that defendant started off with 11 charges in this case, but the charges "went down to five." Defendant argues that this was a false statement that the prosecutor should have corrected. But this testimony was elicited *by defense counsel* for the clear purpose of demonstrating Conn's willingness to lie about the details of the case. Defense counsel had Conn admit that she posted on social media that defendant faced 11 charges, even though the copy of the register of actions that she attached to the post showed only five charges. Conn explained that it started at 11 charges but went down to five. Defense counsel immediately cast doubt on the credibility of that statement when he got Conn to admit that she purposefully lied on social media about defendant missing court dates specifically to paint him in a bad light. There was no need for the prosecutor to correct a statement that the defense counsel himself had introduced specifically for the purpose of correcting Conn's statement.

Overall, none of the contested statements, if corrected, would affect the outcome of defendant's trial either individually or in the aggregate. To the extent that the statements could be considered false or misleading, the prosecutor did not err by failing to correct such minor inaccuracies.

## C. LOCATING AND SERVING WITNESSES

Defendant argues that the trial court erred when it allowed his trial to continue after learning on the third day of trial that the prosecutor had not located and served the subpoenas for four defense witnesses, resulting in two of those planned witnesses being absent from the trial. We disagree.

Under MCL 767.40a(5), a prosecutor or officer must provide "reasonable assistance" to locate and serve process upon a witness upon request:

> The prosecuting attorney or investigative law enforcement agency shall provide to the defendant, or defense counsel, upon request, reasonable assistance, including investigative assistance, as may be necessary to locate and serve process upon a witness. The request for assistance shall be made in writing by defendant or defense counsel not less than 10 days before the trial of the case or at such other time as the court directs. If the prosecuting attorney objects to a request by the defendant on the grounds that it is unreasonable, the prosecuting attorney shall file a pretrial motion before the court to hold a hearing to determine the reasonableness of the request.

Defendant concedes that no written request for governmental assistance appears in the record, but he alleges that the trial court nevertheless ordered the prosecutor to provide reasonable assistance when defense counsel made an informal, oral request for assistance off the record. The trial court acknowledged this request during a hearing in October 2022, when it gave the following statement:

> [M]y understanding is there are some witnesses, [defense counsel], that [defendant] and you wish to have assistance in terms of locating, and those identities have been provided to the officer in charge, who is directed, pursuant to statute, to assist the defense in locating these individuals, provide, according to the statute, [its] reasonable assistance.
>
> So they are directed to provide reasonable assistance under the circumstances to locate these individuals, and insure [sic] they are served *for the trial date of December 14th*. [(Emphasis added).]

But the trial was adjourned several more times, and the subpoenas were revised to reflect the new trial date in June 2023. Defense counsel stated that by that point in time, he and the prosecutor "had discussed off the record" that assistance was necessary again, so they worked together to locate and serve the defense witnesses. Despite multiple attempts by both parties to contact the witnesses in the weeks leading up to the trial, they were unable to secure two witnesses' appearance. At the hearing on defendant's motion for a new trial, the trial court found that the parties had reached "an informal agreement" regarding assistance but that no formal request for assistance was ever made. We agree with the trial court's characterization of events. Without a written request, MCL 767.40a(5) does not impose a duty to provide reasonable assistance in locating and serving witnesses. And even if we accepted the trial court's October 2022 order as a basis for the requested assistance, it was clearly limited to the context of a December 14 trial date. Nearly six months later, circumstances had changed, and the parties entered into a new, informal agreement for assistance that was not required by any statute or court order. Under these

-9-

circumstances, the efforts to locate and serve defense witnesses were not deficient.[8] Accordingly, the trial court did not err when it denied defendant's motion for a new trial or evidentiary hearing.

## D. STANDARD 4 BRIEF

In his Standard 4 brief, defendant additionally argues that the prosecutor committed intentional misconduct by failing to provide discovery materials. Suppression of exculpatory or impeachment evidence constitutes a *Brady*[9] violation if "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v* Chenault, 495 Mich 142, 150; 845 NW2d 731 (2014). The only pieces of discovery about which defendant makes a substantive argument are the CPS records and certain phone data. However, the CPS records were privileged and protected from discovery—the prosecutor did not come into possession of those records until defendant independently obtained them as LM's parent and shared a copy with the prosecutor. Those records revealed the existence of additional medical records, so the prosecutor's alleged delay in providing medical records was attributable to the "delayed" receipt of privileged records which the prosecutor was never entitled to discover.

Defendant also has not established that the phone data, if timely and successfully extracted, would have affected the outcome of his trial. See *id*. at 150. He alleges that the phone contained messages between him and LM that were deleted from the exhibits presented at trial, but we are not convinced that presenting the additional messages (assuming they actually existed) would have affected the outcome of his trial given the overwhelming amount of evidence of guilt and the fact that defendant already testified about the contents of the allegedly missing messages. Defendant also alleges that the phone contained inappropriate or explicit photos of LM and her friends, which would establish a motive to lie about the assault allegations to prevent defendant from "exposing" LM and her friends by telling LM's mother. But both LM and defendant testified about the photos, and defendant does not articulate how showing the jury needlessly cumulative, sexually explicit photos of minors would help his case. Under these circumstances, there was no misconduct requiring reversal.

## IV. COUNSELING RECORDS

According to defendant, the trial court erroneously denied his motion for an *in camera* review of LM's counseling records because they likely contained the dates of the alleged assaults. We disagree.

---

[8] Defendant alternatively argues that defense counsel was ineffective for failing to make a written request for assistance under MCL 767.40a(5). But defendant has provided no affidavits, either in the lower court or on appeal, that would indicate what the witnesses would have testified about. In fact, during the hearing on the motion for a new trial, defendant's appellate counsel conceded that "how these witnesses would have impacted the trial is speculative." Therefore, defendant has failed to establish that the outcome of his trial would have been different if defense counsel had made a formal request for assistance. See *Ackley*, 497 Mich at 389.

[9] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

"A trial court's decision to conduct or deny an in camera review of records in a criminal prosecution is reviewed for an abuse of discretion." *People v Davis-Christian*, 316 Mich App 204, 207; 891 NW2d 250 (2016). Generally, privileged communications between a patient and her psychologist "shall not be disclosed in . . . criminal . . . cases or proceedings, or in proceedings preliminary to such cases or proceedings, unless the patient has waived the privilege . . . ." MCL 330.1750(1). The discovery of privileged records is therefore subject to additional procedural protections:

> [W]here a defendant can establish a reasonable probability that the privileged records are likely to contain material information necessary to his defense, an in camera review of those records must be conducted to ascertain whether they contain evidence that is reasonably necessary, and therefore essential, to the defense. Only when the trial court finds such evidence, should it be provided to the defendant. [*People v Stanaway*, 446 Mich 643, 649-650; 521 NW2d 557 (1994).]

See also MCR 6.201(C)(2). Disclosure should not occur if the requesting party is on a "fishing expedition to see what may turn up." *Id*. at 680.

Defendant argues that LM and her mother had waived their psychologist-patient privilege by disclosing information about LM's therapy to several third parties, including the police, CPS investigators, a forensic interviewer, and Conn. "Once otherwise privileged information is disclosed to a third party by the person who holds the privilege, . . . the privilege disappears." *Oakland Co Prosecutor v Dep't of Corrections*, 222 Mich App 654, 658; 564 NW2d 922 (1997). Defendant once again supports his argument with documents that are not part of the lower court record, but even if we were to consider them, they only summarize the general topics that LM discussed with her therapist. They did not disclose any specific communications that would waive the privilege for the entire counseling record.[10]

Having established that the counseling records remained privileged, we hold that the trial court did not abuse its discretion by concluding that there was no good-faith belief, grounded in articulable fact, that the records were necessary to the defense. See MCR 6.201(C)(2). Defendant argues generally that the records likely contained statements that could be used to impeach LM's testimony regarding the dates and other details of the offenses. Essentially, defendant's request was "no more than a generalized assertion that the counseling records may contain evidence useful for impeachment on cross-examination. This need might exist in every case involving an accusation of criminal sexual conduct." *Id*. at 681. The mere fact that LM was seeing a counselor to discuss the abuse does not, in itself, imply that she would have discussed specific dates, especially when the abuse allegedly took place many times and over an extremely long period while LM was young. Without documentation or some other indication that LM discussed

---

[10] We therefore reject defendant's argument that his counsel was ineffective for failing to raise this futile waiver argument in the lower court. See *People v Ericken*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

particular dates or other specific details with her counselor,[11] his request for those records was a speculative fishing expedition, see *Stanaway*, 446 Mich at 680, and the trial court did not abuse its discretion by denying defendant's request for an *in camera* review.

## V. SPEEDY TRIAL

Defendant next argues that the trial court erred when it denied his motion to dismiss on the basis of a violation of his right to a speedy trial. We disagree.

We review factual findings in connection with a speedy-trial issue for clear error. See *People v Williams*, 475 Mich 245, 260; 716 NW2d 208 (2006). Whether those facts constituted a denial of the right to a speedy trial is a constitutional question that we review de novo. *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999); *People v Gilmore*, 222 Mich App 442, 459; 564 NW2d 158 (1997).

MCL 768.1 states the duty to provide criminal defendants with a speedy trial:

> The people of this state and persons charged with crime are entitled to and shall have a speedy trial and determination of all prosecutions and it is hereby made the duty of all public officers having duties to perform in any criminal case, to bring such case to a final determination without delay except as may be necessary to secure to the accused a fair and impartial trial.

See also US Const, Am VI; Const 1963, art 1, § 20.

"The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *Williams*, 475 Mich at 261. "In contrast to the 180-day rule, [MCL 780.131,] a defendant's right to a speedy trial is not violated after a fixed number of days." *Id*. Our Supreme Court has established a four-factor test to determine whether the right was violated:

> In determining whether a defendant has been denied the right to a speedy trial, we balance the following four factors: (1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant. Following a delay of eighteen months or more, prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury. Under the

---

[11] Defendant argues that his counsel was ineffective for failing to attach supporting documentation to his motion for an *in camera* review, but the documents that purportedly should have been included in the motion were not part of the lower court record. See *Anderson*, 322 Mich App at 628. He argues that these documents showed that the counseling records would likely support the defense theory that LM's allegations were "false memories" and the product of repeating accusations that she had heard from other people. But defendant fails to explain how the counseling records were *necessary* to that defense, MCR 6.201(C)(2), given that defense counsel already had access to those other documents that defendant alleges could be used to impeach testimony and build the same defense without relying on privileged counseling records.

*Barker*[12] test, a presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial. [*Williams*, 475 Mich at 261-262 (quotation marks and citations omitted).]

Defendant was arrested on April 19, 2019, and trial began on June 9, 2023. Accordingly, the delay was presumptively prejudicial, and we must consider *Barker* factors (2) through (4). See *id*.

Regarding the second factor, the bulk of delay was attributable either to defendant or to circumstances not attributable to either party. Defendant caused significant delays by filing multiple motions for bond, to dismiss the case on various grounds, and to compel discovery. Defendant also filed a lawsuit against the presiding judge, which caused the case to be reassigned. The trial court granted defense counsel's request to withdraw from the case, and defendant's newly appointed counsel requested to delay the trial date so that he could become acquainted with the case. Many other adjournments were due to defense counsel's unavailability or were specifically requested by defense counsel in response to discovery issues attributable to both parties. A large delay was caused by the trial court's scheduling issues related to the COVID-19 pandemic.[13] And other delays were caused by scheduling conflicts and docket congestion, which are attributable to the prosecutor but given minimal weight. See *Williams*, 475 Mich at 264 ("Although delays inherent in the court system, e.g., docket congestion, are technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial.") (quotation marks and citation omitted). Overall, this factor weighs against holding that the delays violated defendant's right to a speedy trial.

As for the third factor, defendant did assert his right to a speedy trial when he moved to dismiss on that basis. Concerning the fourth factor, defendant did spend time in jail awaiting trial—he had 1,081 days of jail credit by the time that he was sentenced.[14] However, a lack of prejudice to a defendant's ability to defend himself may outweigh any prejudice caused by a

---

[12] *Barker v Wingo*, 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972).

[13] See, e.g., Administrative Order No. 2020-2, 505 Mich cii (2020) (ordering adjournment of most criminal proceedings, including trials); Administrative Order No. 2020-12, 505 Mich cxlii (2020) (extending the effective date of AO No. 2020-2 indefinitely); Administrative Order No. 2020-10, 505 Mich cxxxix (2020) (delaying all criminal jury trials until the later of June 22, 2020 or as otherwise provided by local court order). This delay is not attributable to the prosecution. See *People v Smith*, 351 Mich App 1, 6; 34 NW3d 593 (2024).

[14] Defendant was eventually released on bond. He contends that he lost the job that he had while on bond because of the nature of the charges. But a speedier trial would not have altered the nature of the charges. The job consequences about which he complains likely would have occurred even if the trial had taken place within several months of his arrest. Similarly, defendant argues that he was prejudiced because the business that he operated before his arrest suffered serious financial loss after Conn tarnished his business reputation by posting about the allegations on social media while the case was pending. But again, an earlier trial would not have changed the nature of the allegations and would not have lessened the impact on his business reputation.

lengthy incarceration. See, e.g., *People v Chism*, 390 Mich 104, 115; 211 NW2d 193 (1973) ("[O]n the matter of prejudice to defendant because of the length of time before his trial, the most important thing is that there is no evidence that a fair trial was jeopardized by delay, although obviously 27 months of incarceration is not an insignificant personal hardship."). Defendant contends that the loss of phone-extraction data[15] prejudiced his defense, but the defense could have sought this information early in the case because police reports indicated that the phone remained in police custody while the case was pending. He also contends that as time went on, defense witnesses became reluctant to testify. But the statements of one of the two witnesses he references as examples were presented through another witness. As for the other witness, defendant asserts that he could have testified that the witness lived with defendant for a period of time and never saw anything inappropriate between defendant and LM. But given that the charges were not limited to any particular dates or times, the fact that defendant had roommates at various times likely would not affect the jury's verdict. Defendant further contends that the impeachment value of police reports and the preliminary examination declined because of the delay, arguing that witnesses at trial could have claimed that they had inadequate memories of making those statements so long ago. But one could also argue that the delay *caused* some variations between trial testimony and prior statements, allowing defense counsel to raise questions or argue more easily about credibility problems.

After weighing all the *Barker* factors, we conclude that defendant was not denied his right to a speedy trial and that the trial court did not err when it denied his motion to dismiss on that basis.

## VI. ATTORNEY-CLIENT PRIVILEGE

Defendant contends that, during a period of construction at the Genessee County Jail, his meetings with his attorney had been audio-recorded without his knowledge.[16] He argues in his Standard 4 brief that the trial court erred when it denied his motion to dismiss on the basis that the recording violated his right to due process, to be free from unreasonable searches, and to the assistance of counsel. We disagree.

---

[15] The phone data was not obtainable because the phone became inoperable at some point while in police custody.

[16] During the period in question, construction work being done at the jail prevented jail inmates from meeting with counsel in separate rooms and instead required the inmates to meet with their lawyers in an open room near a deputy's station or remotely by computer. The prosecution contends that the recordings in question did not audibly capture what was said between defendant and his counsel. Defendant concedes that fact but alleges that the videos were manipulated because allegedly, there was sound in the recordings of another inmate's attorney-client conversations in the same area. But those other recordings are not part of the record, and in any event, defendant only alleges that there was "sound" in those other recordings, not an intelligible conversation.

-14-

This Court reviews a trial court's ruling on a motion to dismiss for an abuse of discretion. *People v Nicholson*, 297 Mich App 191, 196; 822 NW2d 284 (2012). Constitutional issues are reviewed de novo. See *People v Hoang*, 328 Mich App 45, 63; 935 NW2d 396 (2019).

This Court discussed the constitutional implications of violations of the attorney-client privilege in *People v Joly*, 336 Mich App 388, 399-400; 970 NW2d 426 (2021):

> [T]he attorney-client privilege is not a constitutional right. *Violation of the privilege is not, by itself, tantamount to a due-process violation* and alone does not warrant suppression of derivative evidence. Similarly, violation of a defendant's statutory privilege does not, by itself, warrant suppression of evidence, as the Legislature has not seen fit to provide that remedy for a breach of MCL 767.5a.[17] These arguments only go so far, however, as violation of the common-law/statutory privilege can be one part of a broader claim that the government has violated a defendant's right to due process. Caselaw has long recognized that outrageous misconduct by the government in detecting and obtaining incriminating evidence can rise to the level of a due-process violation. [Emphasis added.]

"[W]hen conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial." *Weatherford v Bursey*, 429 US 545, 552; 97 S Ct 837; 51 L Ed 2d 30 (1977). In the context of gathering pretrial evidence, if the violation of attorney-client privilege rises to the level of a due-process violation, then the appropriate remedy is to suppress any evidence gained through that violation under the exclusionary rule. *Joly*, 336 Mich App at 407. And absent any exceptions to the exclusionary rule, the suppression of evidence is also the appropriate remedy for unconstitutional searches or seizures. *People v Goldston*, 470 Mich 523, 539; 682 NW2d 479 (2004).

We conclude that the issue whether the allegedly recorded conversations resulted in a due-process or Fourth-Amendment violation is moot because the trial court entered an order prohibiting the prosecutor "from using, in any way, any recordings that exist of conversations between [defendant] and his counsel" from the period in which he was allegedly recorded, including the case-in-chief, rebuttal, and cross-examination. Defendant does not claim that the prosecutor violated this order. Similarly, we disagree with defendant's argument that he was denied the right to counsel because there was no evidence that the recordings actually impeded defendant's ability to consult with his attorney or otherwise prepare for trial. These circumstances do not justify reversal.

## VII. GREAT WEIGHT OF THE EVIDENCE

Finally, defendant argues in his Standard 4 brief that the verdict was against the great weight of the evidence. In particular, he alleges that if LM had been assaulted as she claimed, then

---

[17] MCL 767.5a(2) creates a statutory source of attorney-client privilege.

she would have had injuries in her genital area. He also contends that there were so many inconsistencies in LM's testimony that it was not believable. We disagree.

This unpreserved issue is reviewed for plain error affecting defendant's substantial rights. See *People v Lopez*, 305 Mich App 686, 696; 854 NW2d 205 (2014). "The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Anderson*, 322 Mich App at 632 (quotation marks and citation omitted). Decisions on credibility are left to the jury. *Id*. A new trial should be granted only if testimony was so impeached that it lost all probative value or if evidence defied physical realities. *Id*. "The hurdle that a judge must clear in order to overrule a jury and grant a new trial is unquestionably among the highest in our law." *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008) (quotation marks and citation omitted).

Contrary to defendant's assertion, LM's testimony was not so impeached that it lacked all probative value. Also, some of her testimony was corroborated by other witnesses and bolstered by exhibits such as her journal entries and messages sent between LM and defendant. Defendant also contends that LM would have exhibited trauma in her genital area if the assaults had occurred as she described. But a doctor testified that it is common for there to be no signs of physical trauma after a sexual assault. Defendant presents several sources that allegedly contradict that statement, but none of that information was presented at trial. Furthermore, a conviction of CSC-I may be based on *any* penetration, "however slight." MCL 750.520a(r). LM's lack of injuries, therefore, would not preclude defendant's convictions. The evidence did not heavily preponderate against the verdict, and defendant has failed to demonstrate any plain error.

VIII. CONCLUSION

None of defendant's arguments are meritorious. He was not denied the effective assistance of counsel, the prosecutor did not make any errors requiring reversal, and the trial court did not abuse its discretion when it denied his motion for an *in camera* review of LM's counseling records. Despite the many delays in the lower court, defendant was not denied his right to a speedy trial. Defendant fails to establish any prejudice resulting from the alleged recording of his conversations with his attorney. And overruling the jury's verdict is not necessary because the verdict was not against the great weight of the evidence.

Affirmed.

/s/ Michael F. Gadola
/s/ Mark T. Boonstra
/s/ Thomas C. Cameron

-16-